UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )    No. 01-10245-MAP
        v.                          )
                                    )
BRADFORD C. COUNCILMAN              )
_____)
```

### DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTION IN LIMINE TO EXCLUDE GOVERNMENT EXHIBITS 3, 4, 25 AND 26 AND FOR A PRE-TRIAL EVIDENTIARY HEARING

Bradford C. Councilman moves this Court *in limine* to exclude government exhibits 3, 4, 25 and 26 as evidence. Exhibits 3 and 4 purport to be copies of software scripts called "procmail" that effectuated the interceptions alleged in the indictment. Exhibits 25 and 26 purport to be copies of fruit (copies of electronic mail messages sent by Amazon.com to bookdealers) of the alleged interceptions. Mr. Councilman also moves the Court to convene a pre-trial evidentiary hearing required by Federal Rule of Evidence ("FRE") 104(a) and in order to afford Mr. Councilman due process of law.

As explained more fully below, the principal grounds for this motion are that:

A. The government obtained the four exhibits during a court-authorized search in 1998 in a manner that prevents it from proving that the exhibits are authentic (as distinguished from falsified), as required by Federal Rule of Evidence ("FRE") 901, that they are originals, as defined in FRE 1001(3) and required in 1002, or that they are duplicates of the originals as defined in FRE 1001(4) and required by FRE 1003.

B. Admission of these exhibits would violate the defendant's right to due process because the manner in which the government obtained the evidence during the search unfairly prejudices and prevents Mr. Councilman from obtaining and presenting objectively verifiable documentary evidence that is essential to the effective presentation of his defense including, but not limited to, the following: (i) documentary evidence that no procmail script was written on Interloc's computers to make copies of Amazon.com-sourced or Biblofind.com-sourced email in January 1998, contrary to what is alleged in the indictment; (ii) documentary evidence that would prove that, if any procmail script was modified in January 1998 to make extra copies of electronic email incoming to Interloc customers, such a procedure was implemented lawfully in order to assure rendition of electronic communication service, as provided in 18 U.S.C. § 2511(2)(a)(1) rather than unlawfully so as to obtain a commercial advantage, as alleged in the indictment; and, (iii) documentary evidence that a procmail script that made copies of Amazon.com-sourced email was <u>first created</u> by Michael Warchut on or about <u>April 13, 1998</u>, after he became aware that he and Peter Krotkov were vulnerable to prosecution, conviction and punishment for perpetrating with Peter Krotkov unauthorized intrusions on or about April 7 and 8, 1998, into computers owned and used by a Greenfield, Massachusetts Internet Service Provider known as Shaysnet.

As set forth in the Declaration of Andrew Good ("Good Declaration"), filed herewith, Mr. Councilman offers to prove the following in support this motion:

1. On May 12, 1998, Massachusetts State Police Trooper Michael Barrett signed an affidavit that formed a part of an application of the federal search warrant that issued in this case. According to the Barrett Affidavit, a copy of which is attached as Exhibit A to the Good Declaration, two of the government's key witnesses, Michael Warchut ("Warchut') and Peter

2

Krotkov ("Krotkov"), were linked by computer records maintained by the University of Massachusetts Office of Information Technology to a series of unauthorized entries ("hacks") into computers owned and used by a company called Shaysnet. According to the Barrett affidavit, some of the Shaysnet hacks occurred on or about April 8, 1998 between 4:50 p.m. through 4:52 p.m. and 4:45 p.m. through 4:49 p.m. Other hacks into Shayset computers occurred at other times.

    2.  According to the Barrett Affidavit, prior to initially contacting Trooper Barrett on April 10, 1998, Shaysnet's principal, David Leonard, had determined from Shaysnet's computer records that University of Massachusetts-Amherst computers had been used to commit the April 8, 1998 hacks. Mr. Leonard communicated on or about the evening of April 8, 1998 and/or April 9, 1998 with David Powicki of the University of Massachusetts-Amherst Office of Information and Technology in a further effort to trace the path of the hacks to their source.

    3. According to the Barrett Affidavit, on April 9, 1998, Michael Warchut emailed Shaysnet's principal, David Leonard. Warchut told Leonard that he was aware that he (Warchut) was under "investigation for some of your problems. I won't stand for being wrongly accused for things I didn't do."  Hence, <u>prior to April 13, 1998</u>, Warchut was aware that he was under investigation for the Shaysnet hacks. For reasons that appear below, Mr. Warchut was also aware <u>prior to April 13, 1998,</u> that computer records would link his use of the Valinet/Interloc computer system to those crimes.

    4.  On <u>April 13, 1998</u>, David Powicki and Scott Conti, employees of UMass's Office of Information Technology, told Trooper Barrett that: (a) the April 8, 1998 Shaysnet hack had been traced by them to a UMass account named HD; (b) times of transmissions from the HD account to the Shaysnet account corresponded closely with the time spans of the April 8, 1998 Shaysnet

3

hacks logged on Shaysnet's computers, per David Leonard; (c) there had been simultaneous transmissions to the HD account from another UMass account named CHUT; and (d) files in the HD account included Shaysnet password files. University of Massachusetts authorities also told Trooper Barrett and the FBI that Krotkov had provided Warchut with access to UMass computers without university authorization.

 5. On April 13, 1998, Krotkov told Trooper Barrett that, on or about April 7, 1998, Warchut had enabled him to obtain unauthorized access to the Shaysnet computer, Shaysnet's customer list stored on its computer, and Shaysnet's password files also stored on its computer. Krotkov also told Trooper Barrett that he had personally had created the CHUT account for Michael Warchut, that "the CHUT account can only be accessed through the use of a unique password chosen by Mr. Warchut," and that "Mr. Warchut also chose the name CHUT for the account." Barrett Aff. at 2.

 6. According to the Barrett Affidavit, during April 13 and 14, 1998 conversations with Trooper Barrett, Peter Krotkov stated that a computer file identified as "procmailcr" would be found on a Valinent/Interloc computer called host.interloc.com. Krotkov also told Trooper Barrett that the procmail script was created by Warchut in Krotkov's presence while Krotkov was an Interloc employee in January 1998. Barrett Aff. at 4 (second full paragraph).

 7. From the foregoing facts recited in the Barrett Affidavit, it is evident that, at least by April 13, 1998, Krotkov and Warchut were well aware that they were under criminal investigation for obtaining unauthorized access to Shaysnet's computers and that they were vulnerable to prosecution, conviction and punishment for hacking into Shaysnet's computers during early April 1998.

8. It is also evident from the facts stated in the Barrett affidavit that, at all material times (but particularly during the court-authorized seizures of data from Interloc's computers on June 8-10, 1998), the investigating agents in this case, including FBI Special Agent Ron Yearwood, knew that, <u>at least as of April 13, 1998</u>, Krotkov and Warchut (a) were aware of the police investigation of their involvement in hacks of Shaysnet computers that were committed on April 7 and 8, 1998; (b) were motivated to eliminate or minimize their own criminal liability for the Shaysnet hacks by attempting to incriminate others in criminal activity, including Bradford Councilman and Michael Manley; and (c) had ongoing and continuous access to computers at Interloc/Valinet prior to and on <u>April 13, 1998</u>, through and including the FBI seizures on June 8-10, 1998.

9. Significantly, the earliest date of Amazon.com-sourced emails seized by the FBI and included in government exhibit 25 (a series of emails purportedly generated by a procmail script, the creation date of which was supposedly in January 1998) <u>is April 13, 1998:</u> which just happens to be the same day that Trooper Barrett conducted interviews of UMass OIT officials Powicki and Conti, and Krotkov about the Shaysnet hacks. See Gov. Exhibit 25, page 1, attached as Exhibit B to Good Decl**.**

10. As of the time of the application for, and execution of the federal search warrant in this case, FBI Special Agent Ron Yearwood, was aware that evidentiary authentication of seized computer data, including the prevention of the loss of data, requires the use of specialized procedures by a qualified computer specialist. See Affidavit of Special Agent Ron Yearwood, dated June 1, 1998 at ¶¶ 20-26, attached as Exhibit C to Good Decl.

11. Prior to the execution of the June 1 search warrant, Special Agent Yearwood submitted a Supplemental Affidavit to Magistrate Judge Charles Swartwood. In the

supplemental affidavit, Special Agent Yearwood explained that due to the large amount of data stored on certain Interloc computers "it is completely impractical to mirror all of the servers' memory. Instead, we plan to conduct a key-word search . . . on the servers." See Supplemental Affidavit of Special Agent Ron Yearwood, at ¶ 3, attached as Exhibit D to Good Decl.

12.  Beginning on June 8, 1998, and ending at approximately 1:15 a.m. on June 10, 1998, the FBI executed the search warrant and seized, among other things, electronic data stored in several computers then located at Interloc, Inc., 377 Main Street, Greenfield, Massachusetts. The warrant authorized the FBI to search for, among other things, the procmail script described by Peter Krotkov to Trooper Barrett during an interview on <u>April 13, 1998</u>.

13. According to an undated memorandum initialed by Special Agent Yearwood, during the seizure in Interloc's office on June 8-10, 1999 FBI Laboratory examiners, Paul W. Frields and Jason S. Bellone, located the procmail script and the "Nile" file which was reported to contain the results of the script (email messages sent from Amazon.com to the users of the business Interloc/Valinet).  The memorandum states that the script and the Nile file were "imaged" by the FBI Laboratory examiners.[1]  See Undated Memorandum of Special Agent Ron Yearwood, at  3, attached as Exhibit E to Good Decl.

---

[1]  "In the forensics field, a "mirror image" of the hard drive generally refers to a bit stream backup. A bit stream backup copies all files and data on the hard drive, including ambient data, which is data stored in nontraditional, not readily accessible storage areas within a computer. See, e.g., Technical Definitions, Bit Stream Back Up Defined, New Technologies Inc., at http://www.forensics-intl.com/def2.html (last visited Dec. 19, 2004); Technical Definitions, Ambient Data Defined, New Technologies Inc., at http://www.forensics-intl.com/def1.html (last visited Dec. 19, 2004). Outside of the forensics field, the term "mirror image," is sometimes used to refer to hard drive copies that are neither bit stream copies, nor evidence grade quality. See, e.g., Wolfgang Wilke, Bit-Stream Image vs. Mirror Image, Lawyers-Be Careful What You Ask For! (Nov. 2003), at http://www.cybercontrols.net/common/wp.asp (requires registration)."  Tye E. Howard, "Don't Cache Out Your Case: Prosecuting Child Pornography Possession Laws Based on Images Located in Temporary Internet Files," *19 Berkeley Tech. L.J. 1227, 1232 n.15 (2004).* As indicated below, the "image" made by the FBI of the four files that appear in disk Q8 are not bit stream, "physical" images of the data as it was stored in original form on Interloc's computers.

14. According to a memorandum written by Trooper Barrett concerning the execution of the search warrant, he interviewed Michael Warchut during the search on June 10, 1998, at approximately 1:00 a.m.  In that interview, Warchut stated that Krotkov had given him access to the UMass Password file and then showed Trooper Barrett a file named UMASS.LOG with a file creation date of 4-6-98.  Trooper Barrett asked Warchut about the file creation date for the UMASS password file named UMASS.LOG. According to Trooper Barrett, "Mr. Warchut advised that this date wouldn't necessarily be the date that the file was created on his machine. He then advised that his recollection was that the file was obtained before the first of January, 1998." See Barrett Memorandum, at 5-6, attached as Exhibit F to Good Decl.  Hence, during the seizure of Interloc files, the authorities conducting the search were on notice that Michael Warchut was capable of changing the file creation dates that appeared on the screen when the file was retrieved, and, for that reason, that computer entries that changed creation dates of files (including, but not limited to, the procmail file and the nile files) could and should have been seized in order to assure the authenticity, provenance, and history of the procmail and nile files that the government proposes to offer as exhibits 3, 4, 25 and 26.

15. The electronic data seized by the FBI is referenced in the FBI Laboratory report.  See Exhibit 1 to Greenberg Report, attached as Exhibit G to Good Decl.  The data seized from the computers was copied by the FBI onto discs labeled Q1 through Q8.

16. During a January 4, 2007 telephone conversation with Assistant United States Attorney Adam Bookbinder, the defense was informed that the method used by the FBI to image and thereby seize the data on disc Q8 differed from the method the FBI used to image and seize the data on discs Q1 through Q7.   Mr. Bookbinder also stated that the original creation dates of the computer files stored on Q8 had been changed by the FBI's imaging/seizure process to the

7

June 9, 1998 seizure date. Mr. Bookbinder also stated that categories of data (including file creation and modification date data) that had been obtained when the FBI imaged and seized Q1 through Q7 had not been not been seized when the data on Q8 was imaged and seized. According to Special Agent Yearwood, the files purporting to be procmail scripts and fruit of the alleged interceptions (government exhibits 3, 4, 25 and 26) were found on FBI disk Q8.

17. According to the preliminary report of the defense expert, Brett A. Greenberg, attached as Exhibit G to the Good Decl.:

> (a) the data on Q8 is not a "physical" copy of the hard drives from which the data was seized, or even a "logical" copy of all the data on those drives, but rather is a "logical copy" of four file folders;
>
> (b) the logical copies on the Q8 disk lack computer validation code verifying that they are in fact, accurate copies of the originals;[2] and
>
> (c) the Q8 files were altered during the process of the government's search.

## ARGUMENT

A. Exhibits 3, 4, 25 and 26 should be excluded because they cannot be properly authenticated.

At all material times, the government knew that Rule 901 of the Federal Rules of Evidence mandates that "as a condition precedent to admissibility," there must be evidence

---

[2] "The second step of a forensic investigation involves authenticating the electronic information acquired through the imaged computer media. Authentication ensures that the forensic image and the original computer media are identical. Again, the forensic software plays the primary role. The software creates a mathematical **validation** figure called a message digest (version 5) hash or what is generally referred to as an "MD5 hash." An MD5 hash is an algorithm that takes a large chunk of data and transforms it into a number known as a hash or hash value. The hash value corresponds to the precise content of the information contained in the imaged copy of the seized computer, acting as a type of "electronic fingerprint" that enables the investigator to verify that the data on the imaged computer media is, and remains, identical to the data on the original computer. If even one bit of data is altered - say, one space of text is added - the hash value would change." Tye E. Howard, *supra* note 1, at 1233-34 (footnotes omitted).

8

"sufficient to support a finding that the matter in question is what its proponent claims." Prior to the June 8-10, 1998, seizures, the government well knew that by April 9, and certainly no later than April 13, 1998: (a) Michael Warchut and Peter Krotkov were aware that Interloc's computers had been used as instruments of their criminal activity, including the Shaysnet hacks in early April 1998; (b) that Warchut and Krotkov were aware that their use of Interloc's computers as instruments of a crime was under police investigation and (c) Warchut and Krotkov had motives and the ability to obstruct the investigation by tampering with electronically stored data in Interloc's computers that would constitute evidence of criminal activity. In these circumstances, this Court should be appropriately skeptical in making Rule 104(a) findings concerning the authenticity of exhibits 3, 4, 25, and 26, which are claimed to be evidence of computerized criminal activity during the period of the alleged conspiracy.

     The government bears the burden of demonstrating that exhibits 3 and 4 are, in fact, the procmail scripts that existed on particular Interloc computers during the conspiracy period and that exhibits 25 and 26 are the contents of the nile file that existed on the Interloc computers. Because the data on Q8 was not authenticated by available computerized means, is incomplete, and has been altered by the seizure process, these exhibits are not admissible.

     The data contained on computer discs Q1 through Q7 contain verification that these copies are complete copies of every physical bit and byte of the information (some of the bytes are referred to as metadata) that did, in fact, exist on the computers from which this data was copied. Q8 not only lacks this type of validation but, because it is also an incomplete copy, it lacks any internally verifiable reference to the computer from which the data was taken. According to the defense expert, the data on Q8 is merely a collection of files that cannot be

determined to be the duplicates of the original data that existed before the seizure took place. Indeed, there is no objectively verifiable means to link the files in Q8 to a specific computer.

Moreover, the prosecutor told the defense counsel that the procmail and nile files on Q8 are not identical to the original ones found on the computers at Interloc prior to the seizures. Not only do these exhibits lack all of the metadata referred to above, but they have been altered so as to include the seizure date. Altered copies are *de facto* non- authentic. *See United States v. Mulinelli-Navas*, 111 F.3d 983, 989-90 (1st Cir. 1997) (rejecting authenticity challenge because defendant did not "make any proffer suggesting that the original had been . . . altered in any way.")   Because the data on Q8 is altered, unverifiable and incomplete, the government cannot provide evidence sufficient to support a finding that these files are in fact, what the government claims they are.  Fed. R. Evid. 901.

In *United States v. Shea*, 211 F.3d 658, 668 (1st Cir. ) the First Circuit noted that "there may be extraordinary cases where the government's loss of evidence requires some sort of remedy despite good faith."   An appropriate remedy in this case would be to exclude electronically stored data (which is highly vulnerable to accidental changes as well as tampering) as evidence because the government had the ability to authenticate it with certainty, but failed to do so. *See id; Gates Rubber Co. v. Bando Chemical Indus.*, 167 F.R.D. 90, 112 (D. Colo. 1996) (holding in civil discovery sanctions case that when collecting evidence for judicial purposes, party had a duty to make an "image backup" rather than a "file by file backup" because the party "had a duty to utilize the method that would yield the most complete and accurate results.")

B. Exhibits 3, 4, 25 and 26 should be excluded because they are not originals and cannot be admitted as a "duplicates"

10

Federal Rule of Evidence 1002 requires an original writing when a party seeks "to prove the content of [that] writing."  The government is offering exhibits 3, 4, 25 and 26 to prove the contents of these writings.  However, these exhibits are neither printouts from the computers on which these files were originally stored, nor can they be shown to accurately duplicate the original data in the computers.  They therefore cannot be considered "originals" under Federal Rule of Evidence  1001 (3).  *See also United States v. Carroll*, 860 F.2d 500, 507 (1st Cir. 1988) (holding that printout of a microfilm copy of bank checks are not originals, but duplicates).

Exhibits 3, 4, 25 and 26 do not qualify as duplicates.  Federal Rule of Evidence 1001(4) defines a duplicate as "a counterpart produced by . . . techniques which accurately reproduce the original."  These exhibits are not accurate reproductions of the original because these files have been altered by the seizure process.  They, therefore, are inadmissible as duplicates.

<u>C. Exhibits 3, 4, 25 and 26 are inadmissible pursuant to Federal Rules of Evidence 1003 & 1004</u>

Even if exhibits 3, 4, 25 and 26 were duplicates, they cannot be admitted under either Federal Rules of Evidence 1003 or  1004, which disallow admission of duplicates if the party seeking to offer them acted in bad faith.  Rule 1003 allows duplicates unless "(1) a genuine questions is raised s to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."  Mr. Councilman's well-supported authenticity challenge and the discussion below demonstrates the ways in which admission of this evidence would be unfair.  Rule 1004 allows for evidence other than the original to be admitted if the originals are lost or destroyed, "unless the proponent lost or destroyed them in bad faith."  The original servers are no longer available.

The government's bad faith can be inferred from the fact that the government knew: (a) it was looking for the procmail script and the nile file at the time of the search and that this information would likely be stored on Interloc's server; (b) Michael Warchut and Peter Krotkov knew that they were vulnerable to prosecution for the Shaysnet hacks and that Interloc's server had been used to perpetrate the Shaysnet hacks; (c) Michael Warchut had ongoing access to Interloc's computers for months after he became aware that he was under criminal investigation for his use of these same computers; (d) Michael Warchut was capable of altering data on computers, including file creation dates so as to falsely make computers files appear to be something that they are not; (e) when the search team found the procmail script and nile file on Interloc's computers, they knew that hidden data indicating the creation, modifications and deletions of such files were likely extant on the hard drives; and (f) even in the face of substantial reasons to believe that Warchut might well have falsified and otherwise tampered with the data on Interloc's server on or about April 13, 1998, and thereafter, the government failed to implement its ordinary copying practice, when it had the means to do so. *See United States v. Garza*, 435 F.3d 73, 76 (1st Cir. 2006) (holding that "evidence . . . destroyed in the course of implementing routine procedures militates against a finding of bad faith."). The Court should infer that the police failed to adequately collect a full bitstream image of the files in question because it knew such files could contradict testimony implicating Bradford Councilman.

<u>B. Exhibits 3, 4, 25 and 26 should be excluded because the documents are not complete and deprive the defendant of the fairness protection afforded by the rule of completeness.</u>

When a party introduces only a partial statement into evidence, Federal Rule of Evidence 106 allows the party against whom it is offered to require the admission of any other part or writing "which ought in fairness to be considered contemporaneously with it." The existence of the procmail script and the nile file on the servers at Interloc tell only a partial story. If the

12

metadata was not lost the defendant would likely be able to present the complete and accurate picture for the jury regarding the provenance and history of these files. The First Circuit has recognized that the doctrine of completeness operates to prevent a distortion in the presentation to the jury by the admission of only partial evidence. *See United States v. Millan*, 230 F.3d 431, (1st Cir. 2000), citing *United States v. Awon*, 135 F.3d 96, 101 (1st Cir. 1998).

In *United States v. Shea*, 211 F.3d 658, 668 (1st Cir. 2000) the First Circuit noted that "there may be extraordinary cases where the government's loss of evidence requires some sort of remedy despite good faith." Even if the government acted in good faith by failing to preserve a complete and accurate copy of the data, excluding incomplete documentary evidence is an appropriate remedy. *See id.*

### D. Admission of exhibits 3, 4, 25 and 26 would deprive the defendant of his 5th Amendment right to due process

In *Olszewski v. Spencer*, 466 F.3d 47, 57 (1st Cir. 2006), the First Circuit declined to decide whether the defendant must prove government bad faith before making out a Fifth Amendment due process violation involving spoliation and alteration of physical evidence. Nevertheless, case law cited by the court in *Olszewski* and other First Circuit cases suggest that a defendant need not show that the government acted in bad faith in order to make out a due process violation. *See* 466 F.3d at 56 n.7; *United States v. Alston*, 112 F.3d, 35 (1st Cir. 1997) ("We are not prepared to say that the government's good faith is always . . . a complete defense to a due process claim where the government deliberately alters evidence that might otherwise have exculpated the defendant.") [3]

---

[3] Even if the Court finds that bad faith is necessary, there is ample evidence to indicate that the government conducted the seizures in a bad faith manner.

13

The metadata, lost by the government, contained material exculpatory to the defense. The data would show that, contrary to the story told by Warchut and Krotkov, as of January 1998, there was no procmail file that made copies of Amazon- or Biblofind-sourced emails.  Moreover the lost evidence would have supported the defense's contention that, if copies of incoming emails were copied as of January 1998, this was done for lawful services rendition reasons Without the lost data, Mr. Councilman's ability to present his defense is unfairly and severely prejudiced.

Not only is the defendant now unable to support his defense with computer evidence, he is also deprived of the ability to impeach the two main witnesses against him with computer evidence.  Mr. Warchut and Mr. Krotkov claim that the procmail script was turned on in January and Mr. Warchut claims that he deleted the entire nile file in February 1998.  The metadata associated with the procmail script would have contradicted these statements. Loss of this evidence has deprived the defendant of his ability to directly challenge the government's case in chief and to impeach its witnesses.[4]  Therefore, the Court should exclude exhibits 3,4, 25 an 26 because to admit them, without the metadata, would be fundamentally unfair to the defendant. *See United States v. Alston*, 112 F.3d 32, 35-6 (1st Cir. 1997) (noting that when the defense is significantly impaired by altered evidence the defendant's due process guarantee of fundamental fairness may be implicated).

                                            Respectfully submitted,

                                            /s/Andrew Good
                                            BBO #201240
                                            Good & Cormier
                                            83 Atlantic Avenue

---

[4] This is apparent from the amount exculpatory material the defense has located on Q1&Q2, as discussed in the defendant's sealed memoranda.

Boston, MA 02110-3711  
Tel: (617) 523-5933  
Fax: (617) 523-7544

### Certificate of Service

I hereby certify that this document was served through the ECF system to the registered participants as identified on the Notice of Eletronic Filing (NEF) on January 16, 2006.

/s/ Andrew Good  
Andrew Good

DATED: January 16, 2007